# In the United States Court of Federal Claims

No. 09-857C

(Filed Under Seal:  April 26, 2010)

Reissued:  May 13, 2010[1]

_____

| | |
|---|---|
| ELECTRONIC DATA SYSTEMS, LLC, | * Post-award bid protest; Technology support |
| | * contract; Cross-motions for judgment on the |
| Plaintiff, | * administrative record; Standard of review – |
| | * *Bannum – Axiom*; Deviation from price |
| v. | * evaluation terms; Failure to amend – |
| | * violation of FAR § 15.206(a); Meaningful |
| THE UNITED STATES, | * discussions; No violation of FAR § |
| | * 15.306(d); Failure to modify solicitation did |
| Defendant, | * not, *per se*, result in violation of FAR's |
| | * discussion requirements; Agency evaluation |
| and | * of data center proposal not arbitrary and |
| | * capricious; No prejudice where |
| BAE SYSTEMS INFORMATION | * disappointed bidder could not show it had a |
| TECHNOLOGY INC., | * substantial chance of receiving contract but |
| | * for the error; *Alfa-Laval* construed; Relief |
| Defendant-Intervenor. | * denied. |

_____

## OPINION
_____

*Richard J. Conway*, Dickstein Shapiro, LLP, Washington, D.C., for plaintiff.

*David M. Hibey,* Civil Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Tony West*, for defendant.

*Michael R. Charness*, Vinson & Elkins, LLP, Washington, D.C., for defendant-intervenor.

**ALLEGRA Judge:**

This post-award bid protest case is before the court on the parties' cross-motions for judgment on the administrative record.  Plaintiff, Electronic Data Systems, LLC (EDS), protests

_____

[1]An unredacted version of this opinion was issued under seal on April 26, 2010.  The opinion issued today incorporates the majority of the parties' proposed redactions and corrects some minor typographical errors.  The redacted material is represented by brackets [ ].

the Department of Treasury's award of a contract to BAE Systems Information Technology, Inc. (BAE) to provide information technology infrastructure support services. For the reasons that follow, the court **DENIES** plaintiff's motion for judgment on the administrative record and **GRANTS** defendant's and defendant-intervenor's cross-motions.

## I.   BACKGROUND

The administrative record in this case reveals the following:

On September 6, 2008, Treasury issued Request for Proposals (RFP) # A08-047, seeking a contractor to provide a "reliable, secure, efficient, effective, and technologically current IT infrastructure" to support the agency's ongoing efforts – a bundle of services the RFP denoted as "Information Technology Infrastructure Managed Services" or "IT IMS." It contemplated the award of an infinite delivery/infinite quantity, performance-based service contract with a base period of three years and two successive two-year award terms, which the awardee could earn through outstanding performance. Individual task orders placed under the proposed contract were to be issued on a time-and-materials, or fixed-price basis (or a combination thereof). The ceiling for the contract is $325 million, with a guaranteed minimum of $250,000. The RFP provided that the award of the contract would be on a negotiated, "best value" basis.

### A.   The RFP

#### 1.   Proposal Requirements

The RFP's requirements took the form, in part, of several Contract Line Items (CLINs). Three of these – CLINS 002, 003 and 004 – were denominated "core services," with portions of each related to end user services, data center operation and local area network (LAN) operations, and disaster recovery and continuity of operations. End user services were sought to provide Treasury employees with "the technology and infrastructure required to perform their job functions," including desktop computers and software for all users, and laptops and personal device assistants (PDAs) for specified users, as well as technological support, including both remote and desk side assistance. The infrastructure services desired involved the development and maintenance of data center operations and network systems, including "major hardware and infrastructure software platforms," such as "network router, switch, hub, and concentrator devices." Finally, the solicitation emphasized that disaster recovery and continuity of operations (COOP) were a "high priority," requiring the awardee to reengineer Treasury's disaster recovery and COOP facilities, processes and procedures. Each of the referenced core services came with a detailed set of requirements – thirty-six each for both end user services and data center and LAN operations, and sixteen for disaster recovery and continuity of operations. Other requirements listed in the RFP involved areas such as information technology security, network infrastructure operations,[2] engineering and testing services, and program and process management.

---

[2] The RFP defined "network infrastructure" as "the collection of network router, switch, hub, and concentrator devices; MS Active Directory, Domain Controller, DNS [domain name system] and DHCP [dynamic host configuration protocol] servers, remote

Offerors were to propose fixed prices for each of these core services based on a population of 2,100 Treasury end users (later increased to 2,700 users).  To define the needs of these employees, the RFP sketched Treasury's current standard configurations in various ways – indicating, for example, the types of work stations to be employed; the base standards for end user's hardware and software; and the number of service installs, moves, calls, etc., that had been made over the past five fiscal years.  The RFP required each offeror to propose a user base expansion price (UBE) to support up to 200 additional end users should the need arise.  The proposed UBE price was to be a fixed monthly charge, per user, which would be added to the base monthly fixed price of the core services CLINs if and when additional users were added.

Two other CLINs are relevant here.  CLIN 005 required the contractor to maintain an on-line catalog of hardware and software which Treasury could use to acquire additional items beyond those included in the core services package.  Offerors were to propose pricing for the on-line catalog at a fixed discount off the "lowest publicly available price," as determined by the General Services Administration federal supply schedule or other government-wide contract vehicles.  While software prices in the catalog had to be updated only annually, the cost of hardware, hand-held devices, peripherals and network and data center equipment had to be updated every six months.

CLIN 006 required offerors to delineate a technical approach and pricing for a sample task project (the Sample Task) designed to be representative of the tasks Treasury might order during the course of the contract.  The Sample Task involved supporting a hypothetical new Treasury office with 100 employees for three months.  The RFP mapped out the following more detailed requirements:

| Local | • | 100 Workstations (laptops) for the 100 person staff with standard configurations. |
| | • | 20 Blackberry devices. |
| | • | 1 color and 1 black and white printer for every 15 people. |
| | • | Network switches and patching, as required. |
| | • | Local print server. |
| Data Center | • | 1 - Oracle server to support the 100 person staff and a Commercial Off the Shelf (COTS) application to provide at least 500 GB data storage. |
| | • | Oracle licenses will be required for each of the 100 people. |
| | • | 1 - IIS server so that the application may be web enabled. |
| | • | Secure remote access facilities as provided to all Treasury DO [Departmental Offices] users. |
| | • | Access to all other Treasury DO applications. |

---

access/VPN [virtual private network] concentrators; the firewall, IDS/IPS [intrusion detection system/intrusion prevention system], encryption and other network security devices; and the SNMP [simple network management protocol]-based network and system management devices."

| Firewall | • A firewall in the DO Data Center must be purchased and configured that limits access from Public Debt to the DO LAN.<br>• The firewall must allow only the 100 authorized TEMP users to access Public Debt.<br>• A firewall must be purchased and configured for the disaster recovery site that provides the same functionality as the production firewall. |
|---|---|

Regarding pricing, the RFP indicated that "[t]he Labor Rates and the on-line catalog established in the contract will be used to build the Task Order (TO) pricing," but that "[o]fferors shall provide a price that supports their approach . . . for this Sample Task as an IDIQ proposal with labor rates, and hardware and software charges."  The prices of specific items were to be reflected on a worksheet that was provided with the RFP.[3]  The RFP indicated that Treasury anticipated approximately ten projects per year of a similar magnitude, and therefore the total price of CLIN 006 was to be calculated by multiplying the Sample Task price by seventy (70) – corresponding to ten projects per year over a period of seven years (the total life of the contract).  That price was then to be included in the offeror's total evaluated price.

---

[3]  This worksheet looked as follows:



-4-

The RFP's performance work statement (PWS) further refined Treasury's objectives using Service Level Agreements (SLAs) that established service level metrics and acceptable quality levels (AQLs) for particular work. Regarding these measures, the RFP explained –

> The IT IMS Contract shall have defined Performance Standards and AQLs for core and supporting service areas established through SLAs. The "Performance Target" defines the desired value or best case scenario for a particular metric within a service area, while the AQL defines the minimum acceptable performance level or worst case scenario which is still considered acceptable for that metric, below which the Contractor will be found "deficient" in performance.

The RFP went on to explain that "[w]hen the Contractor's measured performance on a particular metric is below the AQL value, the Government may assess a disincentive," adding that "not meeting the AQL in one metric in the service area will render the contractor's performance as deficient for the entire service area." Offerors were instructed that their proposals should include a "[d]escription of the Offeror's approach to ensuring how they will meet the performance metrics."

Particularly relevant herein are the SLA standards for certain data center functions, which were outlined in section 4.2 of the PWS. This segment of the RFP defined data center operations as "the centralized support of information technology equipment, resources and the underlying physical infrastructure along with the processes and organizational structure required to establish an IT operating environment." *Inter alia*, the SLAs set performance targets of 99.99 percent availability, not including scheduled downtime, for the data center's e-mail function, file and printing functions, and application transport. Each of these SLAs had an AQL of "no deviation."

## 2.    Evaluation Criteria

The award was to be made to the offeror whose proposal was determined to be most beneficial to the government, with appropriate consideration given to four evaluation factors, listed in descending order of importance: Managed Services Solution, Performance Risk, Price and Small Business Participation. The RFP indicated that, when combined, the non-price factors – Managed Services Solution, Performance Risk and Small Business Participation – were significantly more important than Price.[4] However, the RFP noted that "price may become a determinative factor" as non-price factors reached parity.

Each proposal's technical approach was to be evaluated according to the extent it ensured attainment of program objectives, and the probability that it would succeed in achieving the contract goals. Toward that end, each sub-factor and factor evaluated was to be assigned one of five adjectival ratings (outstanding, good, acceptable, marginal, or unacceptable) based on the

---

[4] The Managed Service Solution factor contained four sub-factors, listed in descending order of importance: Technical Approach, Management Plan, Key Personnel, and Sample Task Response. The Performance Risk factor contained two sub-factors, in descending order of importance: Past Performance and Corporate Experience and Capabilities. The Price and Small Business Participation factors did not have sub-factors.

strengths/significant strengths, weaknesses/significant weaknesses, and deficiencies within each category.[5]  A strength/significant strength was defined as an attribute of the proposal that was likely/very substantially likely to lead or contribute to successful performance.  A weakness/ significant weakness was defined as an attribute likely to increase/substantially increase the probability of unsuccessful contract performance.  A deficiency was defined as "a solicitation requirement that has not been addressed in the Offeror's proposal, or has been addressed in a manner that is deemed unacceptable by the evaluation team members."  The RFP specified that the government would not award a contract to an offeror with a "deficiency" in any factor.  The source selection plan instructed agency evaluators that the adjectival ratings were not necessarily determinative: "The SSA [Source Selection Authority] will not be strictly bound by the ratings," it stated, but rather "retains the discretion to balance the technical merits of each proposal against the proposed overall estimated price and against other offers to determine the best value to the Government."

The RFP required offerors to submit a pricing workbook that Treasury would use to compute the total evaluated price of each proposal.  The total evaluated price consisted primarily of costs associated with the relevant CLINs, *i.e.*, the fixed costs of the core services, the cost of items ordered from the on-line catalog (as calculated using Treasury's estimated expenditures and the offeror's proposed discount rate), and the total price of the Sample Task.[6]  Total price was to be evaluated pursuant to 48 C.F.R. § 15.404-1 for "accuracy, completeness, and reasonableness" and to determine if it reflected "a clear understanding of the requirements, . . . consistent with Offeror's technical price proposal."  The price of the core services CLINs was to be evaluated for "unbalanced pricing" pursuant to 48 C.F.R. §§ 15.404-1(g)(1).  The UBE price was not included in the offeror's total evaluated price, but the RFP stated that it would be considered for fairness and reasonableness as compared to industry norms.

In the RFP, Treasury reserved the right to conduct discussions with offerors in the competitive range.  Offerors in that range were to be invited to make oral presentations to explain their written technical proposals, as well as their qualifications to perform successfully under the contract.  Prior to the receipt of proposals, Treasury amended the solicitation on seven occasions – the last of which occurred on November 20, 2008.

## B.    Proposals and the Evaluation Process

On November 26, 2008, seven offerors submitted proposals in response to the RFP.  On February 2, 2009, Treasury issued its initial price evaluation report on the proposals.  The price evaluation report reviewed each offeror's total price to determine whether it was fair and reasonable.  EDS' total evaluated price was $[], BAE's was $[], and [a third offeror's] was $[].

---

[5]  For example, an offeror could receive a good rating for its technical approach if the proposal "fully me[t] or somewhat exceed[ed] all solicitation requirements, and offer[ed] one or more strengths not offset by weaknesses."

[6]  The Source Selection Plan contained specific instructions for evaluating the price of the Sample Task scenario.  In this regard, it stated that various teams would "evaluate [the] Offeror's use of proposed labor categories, rates and unit prices of hardware/software."

Both EDS' and BAE's total evaluated prices were determined to be reasonable, while the report noted that [the third offeror]'s price was "too high" compared to the other offerors' prices. Accounting for the latter observation, the report found that [the third offeror's] labor rates were [] percent higher than the average calculation of all competitors' rates.

The price evaluation report also identified and compared each bid's individual CLIN pricing. As to the core services, the report found that the prices on two of EDS' disaster recovery CLINs were "too high" when compared to the other proposals. However, it stated that "EDS' . . . overall CLIN prices were fair and reasonable." With respect to CLIN 005, the on-line catalog, BAE and [the third offeror] proposed [] and []-percent discounts, respectively, off the lowest publicly available price, while EDS proposed [] discount. Treasury deemed EDS' catalog pricing "fair and reasonable," and, despite BAE's and [the third offeror]'s discount, considered the difference in catalog prices between the bidders "immaterial."

With respect to CLIN 006, the report found all three offerors' proposals to be "incomplete." [The third offeror] had excluded the cost of firewalls from its CLIN 006 pricing, while EDS had excluded six required color printers. The Treasury team found BAE's hardware and software pricing to be significantly lower than that of both EDS and [the third offeror], and expressed concern that BAE was missing required items. While EDS' and [the third offeror]'s hardware and software costs were $[] and $[], respectively, BAE's costs were only $[]. The report found that this pricing differential occurred because "BAE's sample task did not include pricing for any personal computers, blackberrys or firewalls," and thus "did not adequately price all hardware and software items." Regarding such costs, BAE's acquisition plan stated –

> BAE Managed Services will provide all equipment required to outfit the 100 new users for TEMP [the temporary Treasury office] to include the laptops, laptop accessories, monitors, Blackberries, network printers, network switches, servers, and associated software for the standard manage service user. This equipment is covered in our e-catalog as part of our 1-100 user upgrade. The equipment that falls outside of our normal user service, firewalls, Oracle client licenses, and 500 GB SAN space, will be priced and provided in our proposal. These items are not normal use items for a managed services user and are therefore extra to that service.

BAE's acquisition plan included a table that broke out the specific products to be acquired between those "Included in Managed Services" and those "Outside Managed Services." This table described the products to be purchased with great specificity, e.g., "a Dell Latitude E5400 Laptop." The items listed as "Included in Managed Services" were not listed in BAE's Sample Task Pricing Chart; only two of the table items listed as "Outside Managed Services" were included in the Pricing Chart. BAE received a rating of "acceptable" for its Sample Task.

Contrasting the offerors' UBE prices, Treasury again uncovered a discrepancy in the proposals: while BAE's and [the third offeror']s UBE prices were comparable, at $[] and $[], respectively, EDS' was only $[]. This differential arose from the offerors' different approaches to UBE pricing. While BAE included in its UBE price the same services and hardware and software costs it had included in its core services for base users, EDS included only the labor and other

direct costs associated with adding an additional user, but not the associated hardware and software costs. EDS' plan contemplated that Treasury would order such hardware and software directly from EDS' on-line catalog, which EDS believed would create more transparency and flexibility than a fully-bundled UBE price.

On February 5, 2009, Treasury issued its initial technical evaluation report on all the offers, in which EDS, BAE, and [the third offeror] all received "good" overall ratings. With respect to BAE's technical approach, the report commented that Treasury needed clarification regarding "the reliability tier level for the Herndon Data Center Facility as it relates to the standards defined by the Uptime Institute."[7] Such a rating, the report concluded, could affect the data center's "reliability and redundancy," and thus its ability to meet the 99.99-percent availability SLAs outlined in the PWS.

Following this initial evaluation, on March 25, 2009, a competitive range was established consisting of EDS, BAE, and [the third offeror]. On April 7, 2009, Treasury notified BAE, EDS, and [the third offeror] that their offers were in the competitive range and that discussions would be necessary. In the ensuing discussions, Treasury informed all three offerors that the pricing for their CLIN 006 responses was incomplete. In addition, Treasury notified [the third offeror] that its total price and its proposed labor rates were too high. Treasury did not notify EDS that its disaster recovery CLINs were considered too high. The oral presentations envisioned by the RFP were made on April 20-22, 2009. On March 10, 2009, Treasury amended the RFP, requiring, *inter alia*, that final proposal revisions be submitted on May 12, 2009.

On May 12, 2009, BAE, EDS, and [the third offeror] submitted their final revised proposals. In its final bid, EDS increased its CLIN 006 hardware and software pricing to $[], to account for the six printers missing from its initial bid. BAE minimally increased its CLIN 006 hardware and software pricing to $[], but continued to exclude the bulk of its hardware and software costs from its Sample Task pricing. In its response to Treasury's discussion questions, BAE clarified that the hardware and software costs it had excluded from its Sample Task price were included in its UBE price, which established a flat rate for "all managed services associated equipment and software," including almost all of the hardware and software required for the Sample Task. BAE stated that any hardware or software not included in the UBE package was priced out in the Sample Task worksheet, stating that – "[t]he additional 500GB of Storage Area Network (SAN) space, firewalls, and Oracle client licenses are not part of the bundled managed services offering, therefore we will order them separately through the e-catalog, and priced them separately in the Sample Task pricing." As in its initial proposal, BAE's final proposal specified which hardware and software items were included in its UBE pricing (and thus not priced

---

[7] The Uptime Institute provides a set of Tier Performance Standards that use a series of benchmarks to compare the uninterruptible availability of customized data centers to each other. Currently, there are four tiers of availability, ranging from Tier I at 99.67-percent availability to Tier IV at more than 99.99-percent availability.

separately in the Sample Task), and which items were added for the Sample Task and thus priced out separately in the Sample Task pricing worksheet.[8]

In its response to the discussion questions, which was submitted with its final proposal, BAE clarified that "[t]he Herndon Data Center Facility is a Tier II data center as defined by the Uptime Institute . . . [and] is designed to meet 100% of Treasury's specified data center requirement." Elsewhere in its final proposal, BAE assured Treasury of its "expected performance in meeting and/or exceeding the identified SLA targets for all CLINS." To back up this assertion, BAE described, in detail, its plans to meet the 99.99-percent availability targets by employing, for example: (i) a "clustered Exchange environment" to meet Treasury's e-mail needs; (ii) a "clustered . . . server configuration" to provide the requisite file and printing capability; and (iii) a solution with "high performance blade server environment and Netcool monitoring" to provide for application transport.

Following submission of the final proposals, Treasury issued final technical and pricing evaluation reports on the remaining offerors. Notwithstanding BAE's assurances, Treasury's technical evaluators remained concerned regarding the data center's availability and reliability. Treasury assigned BAE a "significant weakness" for its data center, noting that –

A Tier II Data Center has an end-user availability of 99.75% (22 hours of downtime per year) . . .  This availability rating does not meet the availability/ reliability needed to support the IT IMS SLAs.  The IT IMS SLA threshold is set at

---

[8] As BAE had done initially, its final Sample Task pricing worksheet reflected certain items of hardware and software, as follows:

| Catalogue Item | Description | Hours/Quantity | Unit Price | Total |
|---|---|---|---|---|
| | 500GB SAN Space – Hardware Purchase | 1 | $[] | $[] |
| | 500 GB SAN Space – Hardware Maintenance (incl. in Purchase) | 1 | $ | $ |
| | Oracle License | 100 | $[] | $[] |
| | Oracle License – Maintenance | 100 | $[] | $[] |
| | Firewall – Hardware Purchase | 2 | $[] | $[] |
| | Firewall – Management Software (incl in Purchase) | 2 | $ | $ |
| | Firewall – Hardware Maintenance (incl in Purchase) | 2 | $ | $ |

Accordingly, as it had done it its initial proposal, BAE's CLIN 006 pricing chart listed some items with prices and other items without prices, but did not list a number of other items that were included in its UBE pricing.

a minimum of 99.99% availability. Thus, use of the Herndon Data Center Facility could result in the Offeror failing to meet the metric specified in the SLA, thereby potentially incurring disincentives.

However, the evaluation team believed that this significant weakness was offset by two significant strengths and numerous other strengths in BAE's technical proposal. This led them to conclude that "there is a high probability of success in each of the service areas" and, overall, that BAE's technical solution presented a "strong probability of successful execution with a low degree of risk." BAE's technical approach sub-factor ultimately received an overall rating of "good."

The price evaluation team found EDS's final overall price to be "fair and reasonable," while BAE's was considered "substantially lower." The team determined that "the Government has no basis to question [BAE's substantially lower prices] with the exception of CLIN 006." As to the latter point, the team acknowledged that "the three offerors did not utilize a common basis in developing their proposed HW/SW costs," adding that "BAE indicated that much of its HW/SW costs would be included in its 'user base expansion' prices, and therefore would be excluded from its sample task price." However, unlike in the preliminary evaluation, in this final evaluation, the Treasury team accepted BAE's approach, stating that "BAE was the only offeror to use the User Base Expansion Pricing appropriately for the Sample Task." Treasury's only remaining concern regarding BAE's approach was that the latter's UBE price might not include certain hardware and software for the IIS and Oracle servers. The team noted that EDS' approach to the CLIN 006 pricing was comprehensive and included all components, possibly even some duplicative of those already in its underlying infrastructure.

Following this analysis, the final evaluation results were as follows:

| FACTOR/SUB-FACTOR | MERIT RATING & PRICE |
|---|---|
| **BAE** | **$169,655,418** |
| Overall Non-Price Rating | Good |
| A.  Managed Services Solutions | Good |
|    1.  Technical Approach | Good |
|    2.  Management Plan | Good |
|    3.  Key Personnel | Good |
|    4.  Sample Task Response | Acceptable |
| B.  Performance Risk | Good |
|    1.  Past Performance | Good |
|    2.  Corporate Experience | Outstanding |
| C.  Small Business | Good |

| EDS | $218,780,547 |
| --- | --- |
| Overall Non-Price Rating | Good |
| A.  Managed Services Solutions | Good |
| 1.  Technical Approach | Good |
| 2.  Management Plan | Good |
| 3.  Key Personnel | Acceptable |
| 4.  Sample Task Response | Acceptable |
| B.  Performance Risk | Good |
| 1.  Past Performance | Good |
| 2.  Corporate Experience | Outstanding |
| C.  Small Business | Outstanding |

| [The Third Offeror] | $[] |
| --- | --- |
| Overall Non-Price Rating | Acceptable |
| A.  Managed Services Solutions | Acceptable |
| 1.  Technical Approach | Acceptable |
| 2.  Management Plan | Good |
| 3.  Key Personnel | Good |
| 4.  Sample Task Response | Acceptable |
| B.  Performance Risk | Good |
| 1.  Past Performance | Acceptable |
| 2.  Corporate Experience | Outstanding |
| C.  Small Business | Good |

On July 8, 2009, the Source Selection Authority (SSA) issued his decision awarding the contract to BAE.  In his decision, the SSA discussed the fact that BAE's data center was a Tier II facility, stating –

A Tier II Data Center has an end-user availability of 99.75% (22 hours of downtime per year).  Although the IT IMS RFP did not specify a required availability percentage applicable directly to the data center, this availability percentage is lower than the availability threshold of the IT IMS SLAs which are 99.99%.  Thus, use of a Tier II Facility potentially could result in the Offeror failing to meet the SLA metrics, thereby incurring disincentives.  While this aspect of BAE's proposal raises some concern, I note that BAE did in fact specify in their proposal response that they are able to meet the SLA availability requirements of

99.99% with their proposed solution.  This may mean that BAE has not officially
certified their facility under the requirements of the Uptime Institute, but does have
(or will obtain) the physical infrastructure and capacity to meet the requirements of
the SLAs.

The SSA cited various other "significant strengths" and "strengths," including several associated
with the data center, that supported, in his view, BAE's rating of "Good" for the Technical
Approach subfactor.

In addition, the SSA discussed the disparate approaches to hardware and software pricing
taken by the offerors in CLIN 006, as follows:

The price analysis noted an issue with regard to the pricing of CLIN 006, the
sample task.  Specifically, there was a significant disparity in the HW/SW costs
proposed by the three offerors.  The HW/SW costs for CLIN 006 ranged from a low
of $[] (BAE) to a high of $[] (EDS).  According to the price analysis, it appears the
three offerors did not utilize a common basis in developing their proposed HW/SW
costs.  In particular, BAE indicated that much of its HW/SW costs would be
included in its "user base expansion" prices, and therefore would be excluded from
its sample task price.  Meanwhile, [the third offeror] and EDS included costs for
similar items in their sample task solutions.

For purposes of conducting my tradeoff analysis, I have attempted to determine
what the offerors prices would have been if EDS and [the third offeror] had
proposed HW/SW costs for CLIN 006 on the same basis as BAE.  BAE's price
would be unchanged ($169,655,418).  For EDS and [the third offeror], I cannot
determine exactly what the prices would have been using the BAE approach.
However, using the approach most favorable to EDS and [the third offeror], I have
excluded CLIN 006 HW/SW costs for [the third offeror] and EDS altogether.

The SSA noted that with the adjustments he made, the offeror's prices would be as follows:

| Offeror | Total Price | CLIN 006 HW/SW | Adjusted Price |
|---------|-------------|----------------|----------------|
| BAE | $169,655,418 | $ [] | $ [] |
| EDS | $218,780,547 | $ [] | $[] |
| [Third Offeror] | $[] | $[] | $[] |

The SSA noted that "even if HW/SW costs for CLIN 006 are excluded altogether for EDS and [the
third offeror], BAE is still much lower in price than the other two offerors."

In conducting his best value analysis, the SSA observed that while both EDS and BAE had
received overall non-price ratings of "good," "BAE has a lower price."  He noted that, without the
adjustment associated with CLIN 006, BAE's price was "substantially lower than EDS, by more
than $49 million," and found that BAE's proposal was thus "superior" to EDS'.  The SSA

indicated that he still felt that BAE's proposal was superior to that of EDS even if the CLIN 006 adjustments were made, stating that "even if HW/SW costs for CLIN 006 were excluded for EDS altogether, BAE would still enjoy a price advantage of more then $[] million over EDS." Based on this analysis, the SSA concluded that BAE's proposal represented the "best value" to the government, and, on that basis, awarded the contract to BAE. BAE began performing the IT IMS contract in July of 2009.

### C.     Procedural History

On July 30, 2009, EDS filed a bid protest before the Government Accountability Office (GAO). On September 10, 2009, EDS filed a supplemental protest with GAO. On November 5, 2009, GAO denied the protest.

On December 14, 2009, EDS filed its complaint with this court, claiming, *inter alia*, that Treasury improperly accepted: (i) BAE's incomplete CLIN 006 pricing proposal; and (ii) BAE's non-conforming technical approach. In addition, EDS claimed that Treasury had failed to conduct meaningful discussions with EDS on an equal basis with the other offerors. On January 14, 2010, plaintiff filed its motion for judgment on the administrative record. On January 28, 2010, defendant and defendant-intervenor filed their cross-motions for judgment on the administrative record and responses to plaintiff's motion. Following the completion of briefing on the cross-motions, on March 1, 2010, oral argument was held on the parties' motions for judgment on the administrative record.

## II.     DISCUSSION

Before turning, in detail, to plaintiff's claims, we begin with common ground.

### A.     Standard of Review

The Federal Circuit, in *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355 (Fed. Cir. 2005), instructed that courts must "distinguish . . . [a] judgment on the administrative record from a summary judgment requiring the absence of a genuine issue of material fact." *Bannum* teaches that two principles commonly associated with summary judgment motions – that the existence of a genuine issue of material fact precludes a grant of summary judgment and that inferences must be weighed in favor of the non-moving party – do not apply in deciding a motion for judgment on the administrative record. *Id*. at 1356-57. The existence of a question of fact thus neither precludes the granting of a motion for judgment on the administrative record nor requires this court to conduct a full blown evidentiary proceeding. *Id*.; *see also Int'l Outsourcing Servs., LLC v. United States*, 69 Fed. Cl. 40, 45-46 (2005).[9] Rather, such questions must be resolved by reference to the administrative record, as properly supplemented – in the words of the Federal Circuit, "as if [the

---

[9] *Bannum* was based upon RCFC 56.1, which, in 2006, was abrogated and replaced by RCFC 52.1. The latter rule was designed to incorporate the decision in *Bannum*. *See* RCFC 52. 1, Rules Committee Note (2006); *see also NVT Techs., Inc. v. United States*, 73 Fed. Cl. 459, 462 n.3 (2006); *Bice v. United States*, 72 Fed. Cl. 432, 441 (2006), *aff'd*, 2007 WL 2032849 (Fed. Cir. July 12, 2007).

Court of Federal Claims] were conducting a trial on [that] record." *Bannum*, 404 F.3d at 1357; *see also NEQ, LLC v. United States*, 88 Fed. Cl. 38, 46 (2009); *Int'l Outsourcing*, 69 Fed. Cl. at 46; *Carlisle v. United States*, 66 Fed. Cl. 627, 631 (2005).[10]

*Bannum*'s approach reflects well the limited nature of the review conducted in bid protests. In such cases, this court will enjoin defendant only where an agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (2006); *see also* 28 U.S.C. § 1491(b)(4) (2006). By its very definition, this standard recognizes the possibility of a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which "consider[s] the relevant factors" and is "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 105 (1983); *see Software Testing Solutions, Inc. v. United States*, 58 Fed. Cl. 533, 538 (2003); *Gulf Group, Inc. v. United States*, 56 Fed. Cl. 391, 396 n.7 (2003). As the focus of this standard is more on the reasonableness of the agency's result than on its correctness, the court must restrain itself from examining information that was not available to the agency. Failing to do so, the Federal Circuit recently observed, risks converting arbitrary and capricious review into a subtle form of *de novo* review. *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379-80 (Fed. Cir. 2009).[11] At all events, this court will interfere with the government

_____

[10] In *Bannum*, the Federal Circuit noted that, in *Banknote Corp. of Am. Inc. v. United States*, 365 F.3d 1345, 1352-53 (Fed. Cir. 2004), it had erroneously conflated the standards under RCFC 56 and 56.1, albeit in *dicta*. In this regard, *Bannum* stated that –

> Although it never reached the factual question of prejudice, the *Banknote II* court added that it is the trial and appellate courts' task to "determine whether there are any genuine issues of material fact as to whether the agency decision lacked a rational basis or involved a prejudicial violation of applicable statutes or regulations." This language equates a RCFC 56.1 judgment to a summary judgment under RCFC 56 and is unnecessary to the *Banknote II* holding. Because the court decided the issue by an interpretation of the solicitation, *e.g.*, making a legal determination, the court in *Banknote II* did not need to consider whether the trial court overlooked a genuine dispute or improperly considered the facts of that case.

404 F.3d at 1354. Prior decisions of this court had similarly erred. *See, e.g., JWK Int'l Corp. v. United States*, 49 Fed. Cl. 371, 387 (2001), *aff'd*, 279 F.3d 985 (Fed. Cir. 2002).

[11] In *Axiom*, the Federal Circuit noted that the "supplementation of the record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review.'" 564 F.3d at 1380 (quoting *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005)). In forceful terms, the Federal Circuit rejected the lenient approach to the use of extra-record evidence reflected in *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989), noting that the latter decision: (i) "departs from fundamental principles of administrative law as articulated by the Supreme Court;" (ii) has "questionable" vitality "even within the D.C. Circuit . . . in light of more recent opinions by that court which demonstrate a more restrictive approach to extra-record evidence;" and (iii)

procurement process "only in extremely limited circumstances." *CACI, Inc.-Federal v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983) (quoting *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1372 (Fed. Cir. 1983)). Indeed, a "protester's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a 'best-value' procurement." *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 380 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).[12]

The aggrieved bidder must demonstrate that the challenged agency decision was either irrational or involved a clear violation of applicable statutes and regulations. *Banknote Corp.*, 365 F.3d at 1351, *aff'g*, 56 Fed. Cl. 377, 380 (2003); *see also ARINC Eng'g Servs., LLC v. United States*, 77 Fed. Cl. 196, 201 (2007). Moreover, "to prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996). To demonstrate prejudice, "the protestor must show 'that there was a substantial chance it would have received the contract award but for that error.'" *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)).[13] "Finally,

_____

at all events, "is not the law of this circuit." *Axiom*, 564 F.3d at 1380-81. As this court has subsequently noted, "[w]hile *Axiom* undoubtedly permits limited supplementation of the record with evidence that does not involve the agency's procurement decision (*e.g.*, evidence as to whether a plaintiff would experience irreparable harm), it makes clear that any court in this circuit that relies upon *Esch* to supplement the administrative record more broadly does so at peril of reversal." *NEQ*, 88 Fed. Cl. at 47 n.6.

[12] As noted by the Federal Circuit, "[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996); *see also Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004); *TRW, Inc. v. Unisys Corp.*, 98 F.3d 1325, 1327-28 (Fed. Cir. 1996); *LaBarge Prods., Inc. v. West*, 46 F.3d 1547, 1555 (Fed. Cir. 1995) (citing *Burroughs Corp. v. United States*, 617 F.2d 590, 597-98 (Ct. Cl. 1980)); *EP Prods., Inc. v. United States*, 63 Fed. Cl. 220, 223 (2005), *aff'd*, 163 Fed. Appx. 892 (Fed. Cir. 2006).

[13] A review of Federal Circuit cases indicates that this prejudice analysis actually comes in two varieties. The first is that described above – namely, the ultimate requirement that a protestor must show prejudice in order to merit relief. A second prejudice analysis is more in the nature of a standing inquiry. In this regard, the Federal Circuit has held that "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003); *see also Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002); *Overstreet Elec. Co., Inc. v. United States*, 59 Fed. Cl. 99, 109 n.5 (2003). Cases construing this second variation on the prejudice inquiry have held that it requires merely a "viable allegation of agency wrong doing," with "'viability' here turning on the reasonableness of the likelihood of prevailing on the prospective bid taking the protestor's allegations as true." *McKing Consulting Corp. v.

because injunctive relief is relatively drastic in nature, a plaintiff must demonstrate that its right to such relief is clear." *NEQ*, 88 Fed. Cl. at 47; *see also Banknote Corp.*, 56 Fed. Cl. at 380-81; *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 566 (2000).

**B.      Alleged Improprieties in the Consideration of BAE's proposal**

Plaintiff asserts that Treasury made three clusters of errors in considering BAE's proposal, thereby prejudicing EDS' ability to compete for the subject contract.  First, it asseverates that BAE's proposal contained a materially noncompliant price for CLIN 006 and was ineligible for award.  It asserts that, in accepting the BAE's proposal, Treasury violated 48 C.F.R. § 15.206(a), by failing to amend the RFP to reflect what plaintiff contends were modifications in the requirements associated with the pricing of CLIN 006.  Second, EDS contends that Treasury failed to conduct meaningful discussions on an equal basis with all offerors by failing to advise EDS of the aforementioned modifications and that its disaster recovery CLIN prices were too high. Finally, EDS complains that Treasury acted in an arbitrary and capricious fashion in assigning BAE's technical approach a "Good Rating" despite the latter's failure to meet the "99.99 percent" SLA requirements regarding data center reliability.  The court will discuss these assertions *seriatim*.

**1.      Deviation from the Solicitation Terms – CLIN 006 Pricing**

"It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation." *Banknote*, 56 Fed. Cl. at 386; *see also NEQ*, 88 Fed. Cl. at 47; *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 207, *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004).  This requirement is rooted in the Competition in Contracting Act (CICA) and the Federal Acquisition Regulations (FAR), both of which indicate that an agency shall evaluate proposals and assess their qualities solely based on the factors and subfactors specified in the solicitation. *See* 10 U.S.C. §§ 2305(a)(2)(A)-(3)(A); 48 C.F.R. §§ 15.305(a), 15.303(b); *see also NEQ*, 88 Fed. Cl. at 47; *ManTech Telecomms. & Info. Sys. Corp. v. United States*, 49 Fed. Cl. 57, 66 (2001), *aff'd*, 30 Fed. Appx. 995 (Fed. Cir. 2002).  If the agency changes any evaluation criterion after issuing the solicitation, it must amend the solicitation and notify the offerors of the changed requirement. *See* 48 C.F.R. § 15.206(a); *see also id.* § 15.206(d); *SP Sys., Inc. v. United States*, 86 Fed. Cl. 1, 18 (2009); *Candle Corp. v. United States*, 40 Fed. Cl. 658, 663 (1998).  Consistent with these precepts, in a case such as this, a protestor must show that: (i) the procuring agency used a significantly different basis in evaluating the proposal than was disclosed; and (ii) the protestor

---

*United States*, 78 Fed. Cl. 715, 721 (2007); *see also 210 Earll, LLC v. United States*, 77 Fed. Cl. 710, 718-19 (2006); *Textron, Inc. v. United States*, 74 Fed. Cl. 277, 284-85 (2006).  (This "viability" standard is reminiscent of the "plausibility" standard enunciated in several recent Supreme Court cases. *See Dobyns v. United States*, 91 Fed. Cl. 412, 422-26 (2010) (discussing the "plausibility standard" of pleading drawn from *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007))).  At all events, because of the nature of the allegations of error here, the court is convinced that plaintiff has met this preliminary "standing" threshold.

was prejudiced as a result – that it had a substantial chance to receive the contract award but for that error. *Banknote*, 56 Fed. Cl. at 386-87.[14]

It goes without saying that an agency has "great discretion in determining the scope of an evaluation factor."[15]  Yet, allowing for this, the administrative record still compels the conclusion that Treasury veered from the RFP's requirements for providing cost information on CLIN 006 in endorsing (or at least accepting) BAE's pricing approach.  The RFP advised, regarding CLIN 006 pricing, that offerors should "fully pric[e] out their solution," listing "[a]ll possible costs of the Offeror's solution."  Section L. 6.2 of the RFP called for offerors to submit a price "with labor rates, and hardware and software charges," adding that "[t]he Sample Task worksheet . . . shall be used for submittal of the price proposal for the Sample Task."  The layout of that pricing worksheet is revealing, for it contains headings requiring the offeror to list the "Catalogue Items" and "HW/SW/Comms involved.," and columns in which the offeror was to multiply the number of the designated items needed (*e.g.*, 100 laptop computers) by a "Unit Price," thereby deriving a subtotal that would be included in the "Total" for CLIN 006.  As the organization of this form presupposes, the RFP indicated that "CLIN 006 is for one-time projects . . . awarded through the issuance of Task Orders" and explained that "the on-line catalog established in the contract will be used to build the Task Order (TO) pricing."  The only reasonable reading of these provisions that can be squared with the accompanying worksheet is that which EDS and others (including some of Treasury's evaluators) took away – that the CLIN 006 price had to include all the relevant hardware and software costs, the constituent elements of which were to be separately listed and priced.  There is no way reasonably to conclude that the approach taken by BAE was encompassed by these original provisions.

Further evidence of this lies in the difficulties Treasury encountered in conducting its price reasonableness analysis.  The RFP provided that the offerors' price proposals would be "evaluated for accuracy, completeness, and reasonableness," and that a price reasonableness analysis would be conducted using the techniques listed in 48 C.F.R. § 15.404-1.[16]  Most of the price reasonableness techniques authorized by this regulation – some of which focus on overall

---

[14]  *See also NEQ*, 88 Fed. Cl. at 48 n.8  (citing cases); *Bean Stuyvesant, LLC v. United States*, 48 Fed. Cl. 303, 321 (2000); *Dubinsky v. United States*, 43 Fed. Cl. 243, 266 (1999).

[15]  *Forestry Surveys and Data v. United States*, 44 Fed. Cl. 493, 499 (1999) (citing John Cibinic Jr. & Ralph C. Nash, Jr., Formation of Government Contracts 830 (3rd ed. 1998) (hereinafter "Cibinic & Nash")); *see also Kerr Contractors, Inc. v. United States*, 89 Fed. Cl. 312, 327 (2009); *NEQ*, 88 Fed. Cl. at 48.

[16]  The evaluation of price reasonableness is designed to prevent the government from paying too high a price for a particular contract.  *See DMS All-Star Joint Venture v. United States*, 90 Fed. Cl. 653, 663 n.11 (2010); *Serco, Inc. v. United States*, 81 Fed. Cl. 463, 494 n.48 (2008); *see also* Ralph C. Nash & John Cibinic, "Cost and Price Analysis: Understanding the Terms," 9 No. 1 Nash & Cibinic Rep. ¶ 5 (1995) ("The purpose of a price reasonableness determination is to ascertain that the Government is not paying too high a price.").

price, others of which focus on individual cost elements – cannot be employed rationally if a given price proposal fails to include key price/cost elements. *See id*. at § 15.404- 1(b)(2)(i)-(vii); *DMS All-Star*, 90 Fed. Cl. at 665 n.13; *Serco*, 81 Fed. Cl. at 494. That is surely true of the method that establishes price reasonableness by comparing a given price to those received from competitors, *see* 48 C.F.R. § 15.404-1(b)(2)(i) – a method that the agency tried to employ here. That method cannot rationally be applied if either the price to be compared or the competitors' prices that provide the basis for that comparison omit critical cost elements. *See generally*, 1B John Cosgrove McBride, Thomas J. Touhey, Government Contracts § 9.30[3][c][i] (2009) (hereinafter "McBride & Touhey") ("Competition generally establishes price reasonableness."). Indeed, this method requires "adequate price competition," which exists only where competitors "submit priced offers that satisfy the Government's expressed requirement[s]." 48 C.F.R. § 15.403-1(c)(1) (defining "adequate price competition"); *see also id*. at § 15.404-1(b)(2)(ii) (allowing prior government prices to be compared with the offers provided if "the validity of the comparison can be established"); *SP Sys.*, 86 Fed. Cl. at 18.

Here, BAE's price on CLIN 006 was so out of kilter with that of its competitors that Treasury, by its own admission, could not adjust BAE's price to make it comparable to those of the other offerors in the competitive range. As a result, the agency could not analyze the reasonableness of BAE's price using methods that rely upon such comparisons, as it had done in analyzing the prices of EDS and [the third offeror]. Rather, in determining that BAE's price was reasonable, the agency had to compare the competitors' individual prices for CLINs other than 006 and then to review separately whether BAE's CLIN 006 price was reasonable by reference to its "user base expansion" pricing. In the court's view, it is inconceivable that this disjointed evaluation approach was envisioned from the start – that the agency intended to permit, simultaneously, the use of pricing methodologies that were so fundamentally different as to preclude, for price reasonableness purposes, a rational comparison of competing proposals. Although giving rise, by itself, only to an *arriere-pensee*, this observation, taken together with the plain language of the RFP quoted above, leaves no doubt that the agency's interpretation of the pricing requirements of the RFP, as ultimately applied to BAE's proposal, was no interpretation at all, but rather represented a change in the contract's evaluation terms – one that, under FAR § 15.206(a), should have been accompanied by a formal modification of the solicitation.

## 2.   Failure to Conduct Meaningful Discussions

In its second challenge to the award decision, plaintiff asserts that Treasury was compelled to inform the other offerors that it had changed its requirements regarding the pricing of CLIN 006. It argues that the agency's failure to do so was misleading. EDS also contends that Treasury acted arbitrarily in failing to inform it, during discussions, that its disaster recovery CLIN price was too high.

As the parties agree, agencies generally are required to conduct "meaningful" discussions with all responsible offerors that submit proposals within the competitive range. *See* 48 C.F.R.§ 15.306(d); *see also EP Prods.*, 63 Fed. Cl. at 226; *Dynacs Eng'g Co. v. United States*, 48 Fed. Cl. 124, 131 (2000) (stating that "[t]he law is well-settled that discussions between a contracting officer and offerors must be meaningful"). However, the FAR emphasizes that "the contracting

officer is not required to discuss every area where the proposal could be improved" and that instead "[t]he scope and extent of discussions are a matter of contracting officer judgment." 48 C.F.R. § 15.306(d)(3). Under these provisions, as this court once observed, "'[t]he government need not discuss every aspect of the proposal that receives less than the maximum score or identify relative weaknesses in a proposal that is technically acceptable but presents a less desirable approach than others.'" *Cube Corp. v. United States*, 46 Fed. Cl. 368, 384 (2000) (quoting *ACRA, Inc. v. United States*, 44 Fed. Cl. 288, 295-96 (1999)); *see also EP Prods.*, 63 Fed. Cl. at 226-27; *JWK Int'l Corp. v. United States*, 49 Fed. Cl. 371, 394 (2001), *aff'd*, 279 F.3d 985 (Fed. Cir. 2002) ("The procuring agency does not have to identify every item that might improve an offeror's proposal."); *Dynacs*, 48 Fed. Cl. at 131. Likewise, an agency need not discuss an offeror's price unless the price submitted "'would preclude award to the firm.'" *DMS All-Star*, 90 Fed. Cl. at 669 (quoting *Gen. Dynamics-Ordnance & Tactical Sys.*, 2009 C.P.D. ¶ 217 (2009)). Nevertheless, when conducting discussions with offerors in the competitive range, the agency may not "engage in conduct that . . . [f]avors one offeror over another." 48 C.F.R. § 15.306(e); *see also Kerr Contractors*, 89 Fed. Cl. at 329 ("This regulation does not permit a procuring agency to engage in unequal discussions . . . .").

Plaintiff asserts that because defendant failed to amend the solicitation to reflect new pricing requirements for CLIN 006, it necessarily misled EDS when it did not alert the company to that issue. But, there is no basis for such a *per se* rule – one in which every failure to amend in violation of FAR § 15.206 would inevitably lead to a corresponding failure to conduct meaningful discussions in violation of FAR § 15.306.[17] Even where an amendment should have been made, fairness, equality and discretion all remain the controlling guideposts for applying the discussions requirement to the individual facts encountered. *See* 48 C.F.R. § 15.306(d)(1) ("Discussions are tailored to each offeror's proposal . . . ."). Logic – and the language of FAR § 15.306(d)(3) – suggest that the failure to amend a solicitation leads to the violation of the discussion regulation only where: (i) application of the modified requirement would give rise to an unacceptable deficiency or convert a portion of a proposal into a significant weakness; (ii) the effective modification in requirements is discussed with the awardee, but not with the relevant offeror; or (iii) a failure to conduct discussions would prejudicially mislead an offeror. *See generally*, *JWK Int'l Corp. v. United States*, 279 F.3d 985, 988 (Fed. Cir. 2002) (describing the requirements for discussions); *ManTech Telecomm.*, 49 Fed. Cl. at 71. Hence, in a factual context such as this, whether further or different discussions were required depends upon the impact of the change on the protestor and the need to maintain equal footing among the offerors in the competitive range.

Further discussions were not required here. The application of the modified pricing requirement did not render any portion of EDS' proposal unacceptable or cause some feature thereof to be classified as a significant weakness. Nor did the agency's actions result in unequal treatment. Perhaps, the latter would have been the case had Treasury told BAE that its pricing

---

[17] Plaintiff, of course, is quite correct that had Treasury amended the solicitation, it would have been required to notify the offerors. *See* 48 C.F.R. 15.206(c). But, neither FAR § 15.206 nor FAR § 15.306 treat such a notice as the equivalent of discussions. *Compare* 48 C.F.R. § 15.306(a)-(b) *with id.* at §15.306(d) (distinguishing between other types of communications and discussions (or negotiations)).

approach was appropriate, but not told EDS that it could likewise remove items from its price. But, that did not happen.  Rather, Treasury informed all the final competitors that their Sample Task pricing proposals were incomplete and told both EDS and BAE that they should add items into their pricing – multiple items, in the case of BAE, and six printers, in the case of EDS.  The difference is that EDS chose to follow that advice, while BAE did not, apparently based on the view (later vindicated, but ultimately rejected by this court) that its approach was consistent with the RFP's requirements.  Nor was plaintiff misled – at least not prejudicially so.  Treasury's decision to accept BAE's approach, and error in failing to amend the solicitation to reflect this, both post-dated discussions – in other words, there was nothing wrong with the discussions when they occurred.  And had Treasury amended the RFP to include a revised pricing requirement and done nothing else, it would not have been required to conduct a new round of discussions.[18]  As such, it is hard to see how the "change" in pricing requirements impacted the propriety of either the discussions that occurred or should have occurred.

Undeterred, plaintiff further complains that Treasury violated the FAR by not telling EDS that its disaster recovery CLIN price was "too high," while discussing with [the third offeror] that its overall total price and labor costs were "unreasonably high."  But, this contention is at odds with itself for while it hinges on the notion that these two offerors were not treated alike, it fails to come to grips with the essential fact that the concerns raised by the agency with respect to these offerors were not remotely alike.  In the case of [the third offeror], the concern regarded its overall price, owing, in particular, to the major price component of labor costs.  Moreover, that price was viewed as so high as to render the proposal potentially unacceptable.  EDS' pricing issues, by comparison, neither involved its overall price nor, correspondingly, threatened the acceptability of its offer.  Rather, the agency's much more limited concerns focused only on EDS' price as to a single CLIN and involved only competitiveness.  That Treasury discussed price with [the third offeror], but not with plaintiff, thus did not give rise to the sort of unequal treatment that would violate the FAR.[19]

_____

[18]  In this regard, recall that the RFP stated that "[t]he Government reserves the right to award a contract on the basis of initial offers received, without conducting discussions, in accordance with Federal Acquisition Regulations (FAR) 52.215-1(f), Contract Award.  Therefore, initial offers should contain the offeror's best terms from both a technical and a pricing perspective."  *See also* 48 C.F.R. § 15.306(a)(3) (discussing when awards may be made without discussions); *Galen Med. Assocs.*, 369 F.3d at 1332-33.

[19]  Plaintiff argues that, to the extent it finds ambiguity in the CLIN 006 pricing or the SLAs that establish the 99.99-percent-availability benchmarks, the court should determine that Treasury failed to conduct meaningful discussions when it neglected to clarify such ambiguities.  An agency's failure to clarify known ambiguities in an RFP may constitute a breach of the discussion duty.  *See Bank of America*, 2001 C.P.D. ¶ 137 (2001) (finding a lack of meaningful discussion when the agency failed to clarify a recognized ambiguity in the solicitation that led to significant disparity between offers).  However, in this case the court has found no ambiguity in the cited portions of the RFP and thus need not address plaintiff's argument further.

To be sure, FAR § 15.306(e)(3) gives the contracting officer discretion to inform an offeror that "its price is considered by the Government to be too high or too low."  But neither that provision, nor any other, requires the contracting officer to discuss a proposed price that reflects an acceptable technical approach and is not considered a significant weakness or deficiency.  *See Dynacs Eng'g*, 48 Fed. Cl. at 133; *Public Facility Consortium* I, LLC, 2005 C.P.D. ¶ 170 (2005); *AJT & Assocs.*, 2000 C.P.D. ¶ 60 (2000).  The Federal Circuit made this amply clear in *JWK Int'l Corp.*, making short shrift of the notion that an agency must always discuss prices because their adjustment could materially enhance a proposal's potential for award.  In so concluding, that court reasoned –

> Because both cost and non-cost factors must be considered and the agency has full discretion to rank the importance of the factors, a downward cost adjustment may not always affect the award.  Therefore, cost is not always material, and does not automatically mandate discussions.

*JWK Int'l*, 279 F.3d at 988.[20]  Based on these precedents, Treasury was not required to discuss plaintiff's price on its disaster recovery CLIN because the agency had determined that this price was acceptable, albeit too high.  Therefore, plaintiff's arguments regarding the lack of meaningful discussions fail to persuade.

### 3.     Evaluation of Technical Proposal – Data Center

EDS further argues that BAE's proposal did not comply with the SLAs that established 99.99-percent availability for certain data center services, including e-mail, file/print and application transport.  It treats as virtually self-evident that the "Tier II" data center offered by BAE could not meet the higher system-availability requirements of the RFP.  It was arbitrary and capricious, EDS further contends, for Treasury to accept BAE's proposal in this regard and complains that the agency should have assigned an unacceptable rating (or at least not a good rating) to BAE's managed services solution factor.  But, these claims hinge on several major assumptions that turn out to be false.

First, plaintiff wrongly assumes that the SLAs established solicitation requirements that, like the others in the RFP, had to be fully met by the offerors in their proposals.  But, it appears that the SLAs were different.  A review of the entire RFP suggests that their primary, if not exclusive, function was to establish contractual benchmarks for measuring the awardee's future performance.  In this regard, the RFP indicated that the contract would offer the awardee incentives for meeting these benchmarks and discentives if it did not – an approach that seems to treat compliance with these SLAs more as a matter of contract administration than as something

---

[20]  *See also DMS All-Star*, 90 Fed. Cl. at 669 ("unless an offeror's costs constitute a significant weakness or deficiency in its proposal, the contracting officer is not required to address in discussions costs that appear to be higher than those proposed by other offerors"); *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 372 (2009); *Banknote Corp.*, 56 Fed. Cl. at 385.

to be evaluated in the absolute terms that EDS suggests.[21]  Even if EDS was right on this count, BAE's proposal, in fact, offered a series of technical solutions designed to meet these benchmarks – schematics that not only involved the data center, but also various types of specialized servers and other hardware that would be used, it indicated, in combination with other systems to meet the SLA reliability standards for the various functions.  Although the evaluation teams initially had some misgivings regarding the efficacy of this approach, the SSA ultimately found that BAE's proposal was compliant with the RFP, would pose no significant risks and would likely meet Treasury's requirements.  Plaintiff has provided the court with no basis upon which to conclude that Treasury's findings in this regard were arbitrary and capricious.

One might ask – as plaintiff does – how a data center that is available 99.75 percent of the time can meet a requirement for 99.99-percent availability?  But, this question assumes that the latter requirement existed – and it did not.  The RFP did not require the data center to be rated a "Tier IV" facility – the type that would provide for 99.99-percent availability under the Uptime Institute's classifications.  Indeed, it made no reference whatsoever to the Uptime Institute's classification system, nor, for that matter, to any independent requirements for the availability of the data center itself.  There is, moreover, no indication that the Uptime Institute's classification system correlates in any meaningful, let alone determinative, way with the SLAs' reliability benchmarks, and, in particular, no indication that the 99.99-percent-availability- benchmark in the SLAs is calculated in the same fashion as the 99.75-percent-availability- figures used in the Institute's classifications.  It appears, rather, that the two numbers bear little relation to each other for the Institute's classifications rely on both scheduled **and** unscheduled downtime, while the RFP's 99.99-percent-availability benchmarks consider only the latter.  And there are indications in the record that the classification system and RFP do not use the same periods for measuring compliance – obviously, no minor point when one is measuring availability to the hundredths of a percent.  Given these differences, it is more than conceivable that, in combination with other hardware, a "Tier II" facility could meet the SLA benchmarks for

---

[21]  Plaintiff claims that the SLAs requiring 99.99-percent availability were mandatory minimum requirements, such that BAE's alleged failure to meet the requirement rendered it ineligible for award.  Mandatory minimums are "essentially pass/fail in nature and may lead to the outright rejection of a proposal that falls short."  *ManTech.,* 49 Fed. Cl. at 67.  They "must be clearly identified as such within the solicitation" using language to put offerors on notice that "failure to comply with the requirement will lead to outright rejection of the proposal."  *Id.*  In this case, the SLAs cannot fairly be interpreted as mandatory minimum requirements because they were not pass/fail in nature.  The RFP clearly indicated that the agency would evaluate an offeror's "probability of success" in meeting the SLAs, and established a system of incentives and disincentives to encourage compliance with the SLAs during performance.  These factors militate strongly against a finding that the SLAs constituted mandatory minimum requirements, and the court will not make such a determination.

services such as e-mail.  Certainly, plaintiff has provided no hard facts to the contrary, let alone enough to permit this court to conclude that Treasury's finding was arbitrary and capricious.[22]

## C.      Prejudice

"Not every error by a [contracting officer] justifies overturning an award."  *United Int'l Investigative Servs., Inc. v. United States*, 42 Fed. Cl. 73, 87 (1998), *aff'd*, 194 F.3d 1335 (Fed. Cir. 1999).  Rather, when a challenge is brought on the ground that a procurement involved a violation of a regulation or procedure, "'the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.'"  *Banknote Corp.*, 365 F.3d at 1351 (quoting *Impresa Construzioni Geom. Demonico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001); *see also Axiom Res.*, 564 F.3d at 1381; *Centech Group, Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009).  As noted above, to demonstrate prejudice, a "protestor must show 'that there was a substantial chance it would have received the contract award but for that error.'"  *Alfa Laval Separation*, 175 F.3d at 1367 (quoting *Statistica*, 102 F.3d at 1582); *see also Bannum*, 404 F.3d at 1358; *Galen Med. Assocs.*, 369 F.3d at 1331; *Int'l Outsourcing Servs.*, 69 Fed. Cl. at 47.  "This test is more lenient than showing actual causation," the Federal Circuit has instructed, for the protestor need not "show[] that but for the errors [it] would have won the contract."  *Bannum*, 404 F.3d at 1358; *see also Alfa Laval*, 175 F.3d at 1367; *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996).

Several cases hold that, to demonstrate prejudice in the context of a failed amendment, the protestor must show that it "would have altered its proposal to its competitive advantage had it been given the opportunity to respond to an altered requirement."  *Warren Electrical Constr. Corp.*, 90-2 C.P.D. ¶ 34 (1990); *see also Saratoga Dev. Corp. v. United States*, 777 F. Supp. 29, 38 (D.D.C. 1991), *aff'd*, 21 F.3d 445 (D.C. Cir. 1994); *Mgmt. Sys. Designers, Inc.*, 92-1 C.P.D. ¶ 496 (1992); Cibinic & Nash, *supra*, at 773.  The difficulty for plaintiff in this regard is the sheer size of the differential between its price and that of BAE – in raw terms, slightly more than $50 million, representing nearly a 29 percent spread.  This differential is the proverbial elephant in the parlor – and, strive as it might, plaintiff cannot squeeze that pachyderm out the door.  That price variance weighed heavily on Treasury's best value determination because the two offerors had nearly identical merit ratings – ratings, to be sure, that plaintiff has challenged before this court, albeit unsuccessfully.  While plaintiff correctly notes that prejudice may be found despite the existence of a price differential, it cannot be gainsaid that a significant difference in price, when accompanied by nearly identical technical ratings, can and often does preclude such a finding.  And the cases so indicate.  *See, e.g., Axiom Res. Mgmt., Inc. v. United States*, 78 Fed. Cl. 576, 590 (2007) (no prejudice where significant differences in price); *see also Data Gen.*, 78 F.3d at 1563 (indicating that price differential is a factor that may be considered in assessing prejudice); *see also* 1B Cosgrove & Touhey, *supra*, at § 9.30[3][c][i] ("When technical

_____

[22]  *See Banknote Corp.*, 56 Fed. Cl. at 384 ("[A]n offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably." (quotation and citation omitted)); *JWK Int'l Corp.*, 52 Fed. Cl. at 660 ("[N]aked claims, by all appearances unsupported by anything in the record, fall far short of meeting the heavy burden of demonstrating that . . . findings were the product of an irrational process and hence arbitrary and capricious.").

competence is the principal criterion, and where two offerors are approximately equal in technical competence, the only remaining consideration for evaluation is price."). Indeed, the RFP advised potential offerors that "price may become a determinative factor" as non-price factors reached parity – and that, of course, is exactly what happened.

Now, of course, some of the difference in the total prices here was driven by the offerors' different approaches to pricing the Sample Task. And, it, therefore, is left open for plaintiff to argue that a portion of the existing price differential could be attributed to defendant's failure to amend the solicitation to reflect its view as to the correct pricing of the Sample Task. Plaintiff's CLIN 006 price and thus its overall price doubtlessly would have been lower had it known that a pricing approach like BAE's was permissible, if not preferable. But, how much lower – and to what effect? In the court's view, any such differences would have been inconsequential. In fact, Treasury more than accounted for its error in failing to amend the RFP, by adjusting, in its best value analysis, EDS' overall price to exclude all hardware and software costs from the latter's pricing proposal. Indeed, while the SSA subtracted $[] of these costs from EDS' price, it did not reduce, at all, BAE's price for the $[] of software and hardware costs that the latter actually included in its worksheet. By virtue of this one-sided adjustment, the spread between the two competitors' prices shrank considerably, from $49,125,129 to $[]. Yet, even when reweighing this much smaller differential, the SSA unhesitatingly concluded that BAE's proposal represented the best value to Treasury. Accordingly, this is not a situation where the court must speculate as to what a new award decision would be on remand or how such a decision would be rationalized by the agency. Rather, the source selection documents make clear that even under the best of scenarios – one better than EDS could have dreamed to generate in revised proposals – plaintiff would not have received the contract.[23]   In the court's

_____

[23] As noted, the SSA reduced EDS' hardware and software price to zero while leaving BAE's hardware and software costs intact. Had EDS altered its CLIN 006 pricing proposal (and, correspondingly, its UBE pricing) to conform to BAE's approach, it would have had to include some hardware and software components not included in its UBE, thus bringing its CLIN 006 hardware and software costs above zero. Alternatively, had Treasury required BAE to modify its CLIN 006 proposal to include all hardware and software components, BAE's pricing would have increased according to the cost of the newly included items. Those costs, however, undoubtedly would have tracked BAE's on-line catalog pricing proposed in CLIN 005. This is significant for while BAE proposed catalog prices that were at a []-percent discount off the lowest price available, EDS proposed [] discount, strongly suggesting that, if EDS and BAE employed the same approach, BAE still would have had lower CLIN 006 hardware and software prices than EDS. Every indication, then, is that EDS made out much better under the approach taken by the SSA than it would have under a new proposal.

To be sure, EDS submitted a declaration from one of its corporate officials claiming that, had it known Treasury did not expect offerors to include Sample Task hardware and software costs in CLIN 006, it would have reduced its CLIN 006 price by at least, if not more than, its total hardware and software costs. However, this declaration dealt with this subject in a single paragraph that offered no detailed support for this contention. *See Computer Prods., Inc.*, 97-1 C.P.D. ¶ 97 (1996) (noting that general allegations regarding how a

view, then, there is no basis for it to conclude that the agency's judgment in this regard was arbitrary and capricious.[24]

It is no answer to contend, as plaintiff does, that prejudice ought be presumed where there is a violation of a procurement regulation framed in mandatory terms. EDS claims that FAR § 15.206(a) is such a regulation for it declares that if the government changes its requirements, the contracting officer "shall" amend the solicitation. Plaintiff argues that this regulation would be rendered little more than a toothless exhortation, if an agency, rather than amending a solicitation, could blot out any prejudice associated with the violation. At first blush, this argument seems merely to enforce the plain meaning of the provision at issue. But, of course, the fundamental question posed by the prejudice inquiry is whether a provision should be enforced – the whole purpose of that requirement is to prevent courts from interfering with procurements based on mere technical violations of the rules. If prejudice is to be "deemed" found in a case such as this, what is to prevent it from being presumed away in every case involving a so-called "mandatory" FAR provision? The answer, in a word, is – nothing. To take such a course, the court would have to untether its bid protest jurisdiction from its legal moorings – a result incompatible not only with the Federal Circuit's repeated instruction that a protest may be sustained only upon a "prejudicial" violation of a statute or regulation, *see, e.g., Axiom*, 564 F.3d at 1381 (citing *Impresa*, 238 F.3d at 1333), but with the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, §12, 110 Stat. 3870, from which our jurisdiction derives. It is the latter statute, after all, that requires this court to employ the arbitrary and capricious standard of 5 U.S.C. § 706 – a standard that comes interwoven with the admonition that "due account shall be taken of the rule of prejudicial error." *Id*. at § 706.[25] In

─────────────────

contractor might have bettered its proposal will not suffice to demonstrate prejudice); *see also* Ralph C. Nash, John Cibinic, "Protests: The 'No Prejudice' Rule," 11 No. 5 Nash & Cibinic Rep. ¶ 20 (1997). Indeed, it is difficult to imagine how EDS' exclusion of its hardware and software costs could have bettered the approach taken by the SSA, who reduced the corporation's CLIN 006 hardware and software price to zero in his best value analysis.

[24] *See Data Gen.*, 78 F.3d at 1563 (prejudice not found when, despite pricing error, protestor's price remained substantially higher); *Candle Corp.*, 40 Fed. Cl. at 665 ("If the protestor's price would have remained significantly higher than the awardee's had there been no illegality, and there is no evidence that the SSA's award decision would have changed, it is unlikely the court will find prejudice."); *see also Moore's Cafeteria Servs. v. United States*, 77 Fed. Cl. 180, 188 (2007), *aff'd*, 314 Fed. Appx. 277 (Fed. Cir. 2008) (no prejudice where contracting officer noted that she would still have awarded the contract to the same offeror even if the independent government estimate used to evaluated prices was flawed).

[25] The Supreme Court has held that such prejudice requirements are designed to prevent reviewing courts from becoming "impregnable citadels of technicality." *Kotteakos v. United States*, 328 U.S. 750, 759 (1946); *see also Shinseki v. Sanders*, 129 S. Ct. 1696, 1705 (2009) (construing a comparable prejudice requirement applied in the Veterans Court via 38 U.S.C. § 7261(b)(2)). Notably, in dealing with such prejudice requirements in various administrative law contexts, the Supreme Court has "warned against courts' determining

effectuating the prejudice requirement, then, this court is not abdicating its review powers, but rather giving effect to Congress' intent in mapping the contours of that review. And, it is no less an affront to that intent to "deem" the prejudice requirement fulfilled, than it would be to dispense with that proviso entirely – particularly, given the prevalence of "mandatory" provisions in the FAR.[26]

*Alfa Laval* is not to the contrary. There, Alfa Laval protested a procurement in which a minimum mandatory requirement of the RFP had been waived for its competitor. This court found that the contractor could not establish prejudice because its conforming bid was significantly higher priced than its competitor's. *Alfa Laval Separation, Inc. v. United States*, 40 Fed. Cl. 215, 234-35 (1998). On appeal, the Federal Circuit reversed. It did not, however, do so based upon an assumption that the violation of a mandatory provision of the FAR, *ipso facto*, required a finding of prejudice. Rather, it concluded that the plaintiff had established prejudice because "[t]he only bid competing with Alfa Laval was unacceptable under the standards set out in the RFP," adding that because the plaintiff "submitted the only bid meeting all of the government's requirements, . . . it must have had a substantial chance to receive the contract award." 175 F.3d at 1368. Nor did the court suggest that in cases involving the violation of a mandatory regulation, differentials in pricing were irrelevant to the prejudice inquiry, stating instead, "while price differential may be taken into account, it is not solely dispositive; we must consider all the surrounding circumstances in determining whether there was a substantial chance that a protester would have received an award but for a significant error in the procurement process." *Id*. Thus, in *Alfa Laval*, the finding of prejudice arose not from the mandatory nature of a regulation, but from the unacceptability of the awardee's proposal, based on its failure to comply with a mandatory minimum requirement. *See Hawpe Constr., Inc. v. United States*, 46 Fed. Cl. 571, 580 n.23 (2000), *aff'd*, 10 Fed. Appx. 957 (Fed. Cir. 2001).

Properly construed, *Alfa Laval* thus avails plaintiff naught. For one thing, no technical requirement was violated here, let alone a mandatory one. Rather, the issue was one of pricing. Various provisions in the FAR suggest that, when dealing with a negotiated, "best value"

---

whether an error is harmless through the use of mandatory presumptions and rigid rules rather than case-specific application of judgment, based upon examination of the record." *Id.* at 1704-05.

[26] *See* FAR § 2.101 (stating that "shall denotes the imperative"); *see also*, *e.g.*, FAR § 15.404-2 (indicating that the contracting officer "shall" request a variety of information to support proposal analysis); FAR § 15.606-1(c) ("If a proposal is rejected because the proposal does not meet the requirements of paragraph (a) of this subsection, the agency contact point shall promptly inform the offeror of the reasons for rejection in writing and of the proposed disposition of the unsolicited proposal."); FAR 15.305(a) ("[a]n agency shall evaluate competitive proposals solely on the factors and subfactors specified in the solicitation"); FAR § 19.502-2(b) (the CO "shall set aside" certain acquisitions"); FAR § 22.1002-1 ("Service contracts over $2,500 shall contain mandatory provisions regarding minimum wages and fringe benefits"); *see generally*, *FFTF Restoration Co., LLC v. United States*, 86 Fed. Cl. 226, 244 n.26 (2009).

procurement such as this one, there is flexibility in dealing with deviations from an RFP's pricing terms, provided that the agency ultimately can determine that the overall price is reasonable; that any unbalanced pricing, if it exists, does not pose an unacceptable level of risk; and, of course, that a proposal represents the best value. *See* 48 C.F.R. § 15.404-1(b), 1(g)(2); *see also Diversified Capital, Inc.*, 2004 C.P.D. ¶ 242 (2004).[27]  And, despite some problems, Treasury here could do all these things.  Had Treasury applied the CLIN 006 pricing requirements originally found in the RFP, moreover, it would not have been compelled to reject BAE's proposal as materially noncompliant.  Rather, at most, it may have been required to assist the awardee in bringing its price proposal into conformity with the agency's requirements.[28]  For all intents and purposes, Treasury effectively did just that while determining, despite the deviation in CLIN 006 pricing, that BAE's price was reasonable and represented a better value than that offered by EDS.  Thus, unlike in *Alfa Laval*, enforcement of FAR § 15.404-1 would not have left plaintiff as the only competitor eligible for award, so as to require, *per force*, a finding of prejudice.  *See Hawpe Constr.*, 46 Fed. Cl. at 579-80 (distinguishing *Alfa Laval* and holding that the failure to amend solicitation to reflect relaxed requirement did not result in prejudice where the protestor would not have prevailed under the revised solicitation).[29]  That case, therefore, is inapposite.

In the final analysis, the court remains unpersuaded that plaintiff was prejudiced by the error committed by Treasury in failing to amend the solicitation.  Every indication instead is that the impact of that error was dwarfed by the huge price differential between the relevant proposals and more than offset by the adjustments made by the SSA in his best value determination.  To conclude otherwise would be to depart not only from well-accepted concepts of what constitutes prejudice, but from commercial reality.  Absent a showing of prejudice, plaintiff's case must fail, even though it has been marginally successful in demonstrating that an error occurred in the subject procurement.[30]

---

[27]  Obviously, different considerations might exist if we were dealing with an invitation for bids that anticipated sealed-bidding.  In the latter instance, for example, even relatively minor variations from the pricing terms may lead to a determination that a bid is nonresponsive.  *See* 48 C.F.R. § 14.301; 14.404-2(d)(2)-(3).  But, that is not the situation here – indeed, the pricing terms at issue related only to a single sample task.

[28]  *See, e.g.*, *ManTech*, 49 Fed. Cl. at 70-71; *Pacific Consol. Indus.*, 87-2 C.P.D. ¶ 548 (1987); *Keco Indus., Inc.*, 84-2 C.P.D. ¶ 491 (1984); *see also Data Gen.*, 78 F.3d at 1565 ("We know of no principle or precedent . . . that requires or even suggests disqualifying an otherwise qualified bidder because of inconsistencies in its quoted prices."); *Info. Sciences Corp. v. United States*, 80 Fed. Cl. 759, 781 (2008).

[29]  *See also Myers Investigative and Sec. Servs., Inc. v. United States*, 47 Fed. Cl. 605, 620 (2000), *aff'd*, 275 F.3d 1366 (Fed. Cir. 2002).

[30]  Two leading commentators, in fact, suggest that an amendment may not be required under FAR § 15.206(a), unless there is a "significant impact on competition."  Cibinic & Nash, *supra*, at 770.  As described by Professors Cibinic and Nash, "[a] significant

III.    **CONCLUSION**

This court need go no further.  Measured by the appropriate standard of review, Treasury's conduct, to the extent erroneous, was not prejudicial to plaintiff.  The injunctive relief requested by plaintiff, therefore, is inappropriate.

In consideration of the above –

1.      Plaintiff's motion for judgment on the administrative record is **DENIED** and defendant's and defendant-intervenor's cross-motions for judgment on the administrative record are **GRANTED**.

2.      This opinion shall be publicly released, as issued, after May 11, 2010,  unless the parties identify protected and/or privileged materials subject to redaction prior to said date.  Said materials shall be identified with specificity, both in terms of the language to be redacted and the reasons for that redaction.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

_____

impact on competition occurs when (1) mandatory specifications or terms and conditions are changed, and (2) offerors not receiving notice of the changes would be prejudiced."  *Id*. at 770; *see also id*. at 773 ("Failure to amend an RFP has . . . been excused where the protester was unable to demonstrate that it was prejudiced by the lack of notice.").  It makes little practical difference here whether the better formulation is that no obligation to amend the RFP arose because there was no prejudice to EDS, or that there was an obligation to amend, but that no relief may be afforded owing to the same lack of prejudice – for in either instance, plaintiff loses.